UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:22-CV-61450

SHERICKA BARBER,

    Plaintiff,

vs.

RYDER LAST MILE, INC.,

    Defendant.
_____/

## COMPLAINT

Plaintiff, Shericka Barber, brings this action to address the conduct by Defendant, Ryder Last Mile, Inc. ("Ryder"), as follows:

### *Parties, Jurisdiction, and Venue*

1.    **Plaintiff, Shericka Barber**, was and is a resident of Broward County, at all times material, she is over 18 years old, and she is sui juris.

2.    Ms. Barber is a Black woman.

3.    **Defendant, Ryder**, is a sui juris foreign for profit corporation that conducts business in Broward County, Florida, and employs more than 100 people.

4.    Ryder maintains offices in Broward, and it employed Ms. Barber in Broward.

5.    Defendant was and is responsible for the conduct, acts, and omissions of its officers, directors, managers, supervisors, and employees at all times relevant to this action.

6.    This is an action for damages greater than $100,000.00 and this Court has jurisdiction over this matter.

1

7. This Court has original jurisdiction over Ms. Barber's claims that arise under federal law pursuant to 28 U.S.C. §1331 and 42 U.S.C. §12101, et seq., and supplemental / pendent jurisdiction over her related state law claim(s) pursuant to 28 U.S.C. §1367.

8. Venue is proper pursuant to 28 U.S.C. §1391(b)(ii) because Ryder is located within this District and because the actions complained of occurred within this District.

9. All conditions precedent occurred or were performed.

### Common Factual Background

10. Ms. Barber began working for The MDX Group ("MDX"), a logistics services company, as a customer service representative in 2014.

11. Ms. Barber worked at MDX's Pembroke Park, Florida delivery hub.

12. Ryder purchased MDX in April 2018.

13. As a result of Ryder's acquisition, Ms. Barber became a Ryder employee with the title of Customer Service Operations Lead on April 2, 2018.

14. Ms. Barber was an exemplary employee in her position.

15. Anthony Dipaolo, Ms. Barber's general manager, Abou Keita, her direct manager, and Randy Scott, a warehouse associate, were also former MDX employees that Ryder hired and kept in their same positions.

16. Ashley Lacadre is, or was, a Ryder employee, who is a Hispanic female and was similarly-situated to Ms. Barber.

17. Ms. Barber retained the undersigned counsel and agreed to pay her counsel a reasonable fee for all services rendered.

### COUNT I – SEXUAL HARASSMENT

## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

Plaintiff, Shericka Barber, reincorporates and re-alleges paragraphs 1 through 17 as though set forth fully herein and further alleges as follows:

18. Title VII, at 42 U.S.C. § 2000e-2(a), makes it unlawful for an employer to discriminate against an employee with respect to the employee's compensation, terms, conditions, or privileges of employment because of the such individual's race, color, religion, sex, or national origin.

19. Ryder was at all times material an "employer", as the term is defined at 42 U.S.C. § 2000e.

20. Ms. Barber belongs to a protected group as a Black woman.

21. Ms. Barber was subjected to unwelcome sexual advances/harassment by Randy Scott because she is a female.

22. Randy Scott had a history of sexually harassing women in the MDX workplace before Ms. Barber began working there in 2014.

23. Ms. Barber was informed of Randy's inappropriate behavior by other female coworkers when she was hired, and in time, she became the subject of his sexual harassment as well.

24. Randy frequently made comments about Ms. Barber's breasts and indicated that he would do sexual things to her if he had the opportunity.

25. From 2016-2018, this behavior escalated and Randy began directing sexual gestures to Ms. Barber, such as grabbing his private parts, and making lude comments such as, "You cannot take my penis because of my height."

3

26. Randy made some of these comments and gestures in the presence of Ms. Barber's managers, Mr. Dipaolo and Mr. Keita, who both ignored the inappropriate behavior by not saying anything to Randy or asking Ms. Barber if she felt uncomfortable.

27. As managers, both Mr. Dipaolo and Mr. Keita were obligated – but failed – to either address Randy's harassing behavior with him or to report it to other personnel within Ryder.

28. Without management curtailing his behavior, Randy continued sexually harassing Ms. Barber after Ryder purchased MDX.

29. Randy's sexual gestures, unwanted touching, and vulgar comments occurred virtually every time he interacted with Ms. Barber, which was on a daily basis, making the workplace utterly intolerable due to the frequency and nature of his harassment.

30. Ms. Barber ultimately reported the sexual harassment to a representative of the Human Resources Department named Nadia Noel, but no action was taken against Randy.

31. By 2019, Randy would approach Ms. Barber's desk four to five times a week and grab his private parts and/or lick his lips, and say things such as he wanted to "bend her over" and that he wanted to "eat her pussy for breakfast".

32. Randy also developed the habit of leaving his work area in the warehouse and following Ms. Barber to other areas of the office so that he could continue his harassment.

33. On several occasions in 2019, Randy would watch Ms. Barber arrive to work from a warehouse window and wiggle his tongue in between his fingers while looking at her.

34. On one such occasion, Randy left the warehouse and walked to Ms. Barber's office to ask if he could smell her vagina, which occurred in front of Abou Keita and Anthony Dipaolo.

35. Warehouse workers were not supposed to visit the office whenever they felt like it; the policy was for any paperwork to be passed through a window that connected the two areas.

36. Despite this policy, Mr. Keita and Mr. Dipaolo never told Randy to stop coming into the office uninvited to harass Ms. Barber.

37. In March 2020, Ms. Barber dropped her keys on the floor and as she bent over to pick them up, Randy pressed the front of his pants (his privates) against her backside while saying, "Come on baby, you know what you do to me."

38. The incident in the preceding paragraph occurred in the direct and immediate presence and view of manager Abou Keita.

39. Ms. Barber turned to Mr. Keita for assistance, but he did not say anything to Randy or report this unwelcomed sexual advance to anyone else in management at Ryder.

40. On another occasion, Randy told Ms. Barber that he got in trouble with his wife because he was constantly having sexual dreams about her (Ms. Barber).

41. The cumulative effect of Randy's relentless sexual harassment at work made the workplace so intolerable that it caused Ms. Barber to start having panic attacks and she no longer wanted to go to work.

42. Ms. Barber began seeing a psychiatrist to cope with the stress and anxiety she endured as a result of the sexual harassment.

43. On or around May 23, 2021, Mr. Dipaolo informed Ms. Barber that he was changing her work shift from 7:45 a.m. until 4:15 p.m. to 9:00 a.m. to 5:30 p.m.

44. Ms. Barber immediately objected to the schedule change, because she needed to pick her children up from school before 5:30 p.m. as she had been doing for years.

135 San Lorenzo Avenue, Suite 770, Miami, FL 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

45. However, Ms. Barber also objected because the new proposed schedule would increase the overlapping time she worked with Randy towards the end of the day, when no managers were present.

46. Despite her objections, Mr. Dipaolo still changed Ms. Barber's schedule.

47. Upon hearing of her new schedule, Randy approached Ms. Barber and said that they would be all alone and he could have her all to himself now.

48. Ms. Barber was the only employee whose schedule was changed.

49. On May 24, 2021, faced with the possibility of having to endure more time with Randy or quit, Ms. Barber notified Ryder that she would be resigning in two weeks.

50. The very next day, on May 25, 2021, Ms. Barber encountered Randy in an occupied employee break room and he refused to move out of the way of a vending machine she wanted to use saying, "if you want a drink, you need to give me some of that pussy."

51. The incident in the above paragraph occurred in front of other coworkers and Ms. Barber immediately reported it to her manager, Abou Keita, right after it happened.

52. Ms. Barber reported this incident to human resources.

53. As a result of Randy's continued sexual harassment and Ryder's failure to address his behavior, Ms. Barber did not finish her last two weeks of work as she originally planned to do, but instead stopped working immediately.

54. Thus, the harassment was sufficiently severe and pervasive to alter the terms and conditions of Ms. Barber's employment, and the harassment created a discriminatorily abusive working environment.

55. Ryder is liable for Randy Scott's conduct because its managers and human resources personnel observed his sexual harassment towards Ms. Barber and did nothing about it, and did nothing about Ms. Barber's direct complaints of the harassment.

56. Ms. Barber was forced to resign because of Ryder's refusal to address the workplace harassment, suffering the loss of her job and all attendant fringe benefits, and she suffered emotional damages.

WHEREFORE, Plaintiff, Shericka Barber, demands the entry of a judgment in her favor and against Defendant, Ryder Last Mile, Inc., after trial by jury, for compensatory damages, including for emotional distress damages, to be placed in the position she would be in, but for the unlawful discrimination, through compensation of lost past and future wages and employment-related benefits, punitive damages, and awarding her attorneys' fees, costs, and all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT II – RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

Plaintiff, Shericka Barber, reincorporates and re-alleges paragraphs 1 through 17 as though set forth fully herein and further alleges as follows:

57. Title VII, at 42 U.S.C. § 2000e-2(a), makes it unlawful for an employer to discriminate against an employee with respect to the employee's compensation, terms, conditions, or privileges of employment because of the such individual's race, color, religion, sex, or national origin.

58. Ryder was at all times material an "employer", as the term is defined at 42 U.S.C. § 2000e.

59. Ms. Barber belongs to a protected group as a Black woman.

60. Ms. Barber possessed the skills, background, and qualifications necessary to perform the duties of her position.

61. Ms. Barber performed her work for Defendant satisfactorily, and she was in all respects a good employee of Defendant.

62. Ms. Barber's manager, Anthony Dipaolo, treated her differently from other Ryder employees because she is Black.

63. One morning in late 2018, Ms. Barber's eleven-year-old daughter had an asthma attack that required her to be hospitalized.

64. Ms. Barber went to the hospital to be with her daughter instead of reporting to work, and she asked Mr. Dipaolo to take the day off to care for her daughter.

65. Mr. Dipaolo responded that Ms. Barber did not have any remaining paid time off available to her, and that she needed to bring her sick daughter to the office after leaving the hospital and to let her sick daughter sit in a conference room for the remainder of Ms. Barber's work day.

66. A Ryder human resources representative later confirmed that Ms. Barber did in fact have days of paid time off available, contrary to what Mr. Diapaolo told Ms. Barber.

67. Ryder did not require any of its other similarly situated non-Black employees who worked at its delivery hub(s) to bring their sick children to work with them when they did or did not have paid time off available to them.

68. Ryder also hired a Hispanic female named Ashley Lacadre to work in its office and alongside Ms. Barber.

69. Anthony Dipaolo immediately began treating Ms. Lacadre more favorably than Ms. Barber.

70. Once Ms. Lacadre began working, Ryder instituted a policy that prevented Ms. Barber and Ms. Lacadre from taking off the same days from work.

71. Therefore, Ms. Lacadre and Ms. Barber both had to request time off from work in advance so that it could be approved by Mr. Dipaolo.

72. Mr. Dipaolo would immediately approve any request for time off that Ms. Lacadre made.

73. However, Mr. Dipaolo would constantly wait until the last minute to let Ms. Barber know that her leave time was approved no matter how far in advance she made the request.

74. Mr. Dipaolo's intentional delay tactic made it difficult for Ms. Barber to schedule important medical appointments and family events because she did not know if her leave would be approved.

75. Ms. Barber complained to human resources about this disparate treatment, and nothing was done about it.

76. Ms. Barber was subjected to adverse job action that impacted the terms, conditions, and privileges of her employment as a result of Mr. Dipaolo's discriminatory treatment.

77. Ms. Barber suffered the loss of her job and all attendant fringe benefits, and she suffered emotional damages.

WHEREFORE, Plaintiff, Shericka Barber, demands the entry of a judgment in her favor and against Defendant, Ryder Last Mile, Inc., after trial by jury, for compensatory damages, including for emotional distress damages, to be placed in the position she would be in, but for the unlawful

discrimination, through compensation of lost past and future wages and employment-related benefits, punitive damages, and awarding her attorneys' fees, costs, and all interest allowed by law, and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Shericka Barber, demands a trial by jury of all issues so triable.

Respectfully submitted on August 3, 2022.

                        s/Toussaint Cummings, Esq.
                        Toussaint Cummings, Esq.
                        Fla. Bar No. 119877
                        toussaint@fairlawattorney.com
                        FAIRLAW FIRM
                        135 San Lorenzo Avenue
                        Suite 770
                        Miami, FL 33146
                        Tel:   305.230.4884
                        Counsel for Plaintiff